IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

E. M. BLAJOS,

    Plaintiff,    No. CIV S-02-1454 GEB JFM P

    vs.

R. CAMPBELL, et al.,

    Defendants.    <u>FINDINGS & RECOMMENDATIONS</u>

_____/

        Plaintiff is a state prisoner proceeding through counsel with a civil rights action pursuant to 42 U.S.C. § 1983. This action was filed on July 3, 2002 and is proceeding on plaintiff's second amended complaint, filed April 28, 2003. Plaintiff claims that defendants violated his rights under the Eighth and Fourteenth Amendments by acting with deliberate indifference to his safety after he provided prison officials with information about members of two prison gangs. Plaintiff alleges that defendants failed to house him on a sensitive needs yard and that as a result he was stabbed twenty-seven times on January 6, 2001, while housed in administrative segregation at California State Prison-Sacramento (CSP-Sacramento).

        This matter is before the court on the motions of the two remaining defendants, Bunnell and Borrego, for summary judgment.[1] The court heard oral argument on the motion on

---

[1] Defendant Lemon was dismissed pursuant to stipulation by order filed October 30, 2006.

1

August 17, 2006. John Hendry, Esq. appeared as counsel for plaintiff. Douglas R. Thorn, Esq. appeared as counsel for defendant Bunnell. William Cashdollar, Deputy Attorney General, appeared as counsel for defendant Borrego.

SUMMARY JUDGMENT STANDARDS UNDER RULE 56

Summary judgment is appropriate when it is demonstrated that there exists "no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).

> Under summary judgment practice, the moving party
> always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact.

Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). "[W]here the nonmoving party will bear the burden of proof at trial on a dispositive issue, a summary judgment motion may properly be made in reliance solely on the 'pleadings, depositions, answers to interrogatories, and admissions on file.'" Id. Indeed, summary judgment should be entered, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. See id. at 322. "[A] complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." Id. In such a circumstance, summary judgment should be granted, "so long as whatever is before the district court demonstrates that the standard for entry of summary judgment, as set forth in Rule 56(c), is satisfied." Id. at 323.

If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). In attempting to establish the existence of this factual dispute, the opposing party may not rely upon the

allegations or denials of its pleadings but is required to tender evidence of specific facts in the form of affidavits, and/or admissible discovery material, in support of its contention that the dispute exists.  See Fed. R. Civ. P. 56(e); Matsushita, 475 U.S. at 586 n.11.  The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law, see Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987), and that the dispute is genuine, i.e., the evidence is such that a reasonable jury could return a verdict for the nonmoving party, see Wool v. Tandem Computers, Inc., 818 F.2d 1433, 1436 (9th Cir. 1987).

       In the endeavor to establish the existence of a factual dispute, the opposing party need not establish a material issue of fact conclusively in its favor.  It is sufficient that "the claimed factual dispute be shown to require a jury or judge to resolve the parties' differing versions of the truth at trial."  T.W. Elec. Serv., 809 F.2d at 631.  Thus, the "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'"  Matsushita, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e) advisory committee's note on 1963 amendments).

       In resolving the summary judgment motion, the court examines the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any.  Fed. R. Civ. P. 56(c).  The evidence of the opposing party is to be believed.  See Anderson, 477 U.S. at 255.  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party.  See Matsushita, 475 U.S. at 587.  Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.  See Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898, 902 (9th Cir. 1987).  Finally, to demonstrate a genuine issue, the opposing party "must do more than simply show that there is some metaphysical doubt as to the material facts . . . .  Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Matsushita, 475 U.S. at 587 (citation omitted).

On July 18, 2003, the court advised plaintiff of the requirements for opposing a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure. See Rand v. Rowland, 154 F.3d 952, 957 (9th Cir. 1998) (en banc), cert. denied, 527 U.S. 1035 (1999), and Klingele v. Eikenberry, 849 F.2d 409 (9th Cir. 1988).

## ANALYSIS

I. Defendant Borrego's Motion for Summary Judgment

    a. Undisputed Facts

Plaintiff and defendant Borrego agree that the following facts are undisputed.

On August 23, 1978, plaintiff was convicted of first degree murder and assault on a peace officer, and he was sentenced to a prison term of seven years to life for those offenses.

On or about September 14, 1978, plaintiff was first received by the California Department of Corrections and Rehabilitation.

From approximately 1978 through 1983, plaintiff was housed in a protective housing unit.[2]

---

[2] An initial classification form 128-G, dated February 1, 1979, documents prison officials' evaluation of whether plaintiff should be housed in PHU or SHU. (Blajos Decl., Attachment 1.) Warden Sumner noted that plaintiff had been committed to the CYA for a "murder involving neighborhood gang friction." (Blajos Decl., Attachment 1.) Plaintiff's need for protection was noted:
> Blajos has real need for protection, as he came into conflict with the EME when he refused to carry out a contract to assault NF members in the county jail. Additionally, he is the cousin of a well known EME member. Mr. Madding has done considerable investigation on this case regarding the need for protection and has previously been directed by ICC to submit his information for the confidential folder. This would supplement existing information in the confidential file concerning his need for protection.

(Id.) Warden Sumner recommended plaintiff be transferred for suitable housing in SHU elsewhere, but stated plaintiff would be retained in his present restricted housing cell in PHU due to a lack of available SHU cells. (Id.)

4

1     Official records reflect that from 1983 through November 2000, plaintiff
2  was an inmate housed in the general population at various prison facilities.
3     From 1983 through November 2000, there were instances when plaintiff
4  was placed in Administrative Segregation for misconduct.
5     Defendant Borrego was an employee of CDCR who worked in Folsom
6  State Prison's (FSP) Investigative Services Unit (ISU) at all relevant times material to the matters
7  at issue.
8     On November 15, 2000, inmate Osuna was assaulted in the yard at FSP.
9     Plaintiff concedes defendant Borrego did not have official authority to
10 place plaintiff into Administrative Segregation.[3]
11    Defendant Borrego was a Correctional Officer in the FSP ISU who was
12 assigned to investigate the November 15, 2000 battery on Osuna.
13    On or about November 21, 2000, defendant Borrego, an IGI (Inmate Gang
14 Investigator) interviewed plaintiff in connection with the investigation of the November 15, 2000
15 incident and submitted a confidential report regarding the investigation. The parties dispute what
16 went on during that interview.
17    On November 22, 2000, plaintiff appeared before the Institutional
18 Classification Committee (ICC) for initial review of his placement in Administrative
19 Segregation. After reviewing the information and documentation available on that date, the ICC
20 determined that plaintiff would be retained in Administrative Segregation at FSP pending
21 completion of the investigation. The ICC assessed plaintiff's yard as controlled compatible 4,
22 which is a Southern Hispanic yard. Plaintiff participated in this ICC hearing and the records
23 /////

---

[3] However, plaintiff maintains defendant Borrego was in a position to influence such decisions. (Blajos Decl., ¶¶ 9, 10.)

reveal that "he understood the classification action and had no questions." Borrego did not and would not have sat on the ICC.

Defendant Borrego completed his investigation and on November 27, 2000, prepared a CDCR 115, disciplinary document, charging plaintiff with battery on inmate Osuna.

Defendant Borrego conducted an investigation into the Osuna assault, prepared a report, and charged plaintiff with being involved in the Osuna assault.

On November 30, 2000, plaintiff again appeared before the ICC for review of his continued placement in Administrative Segregation. The Committee determined that plaintiff would continue to be retained in Administrative Segregation at FSP. The ICC also assessed plaintiff's yard as controlled compatible yard 4, which is a Southern Hispanic yard. This ICC Chrono reveals that plaintiff participated in this ICC hearing and did not object to his placement. Borrego did not and would not have sat on the ICC. Plaintiff concedes that Borrego was not involved in the ICC.

On December 16, 2000, plaintiff was transferred to CSP-SAC and housed in administrative segregation.[4]

On December 19, 2000, an ICC hearing was held to review plaintiff's classification to be held in Administrative Segregation. (CDC-128G form dated 12-19-00 (Blajos Decl., Attachment 6; Pitoniak Decl., Attachment 8 [Docket No. 97, Ex. A]).) Committee notes from this hearing reflect that plaintiff was present and participated in the hearing, that he had been double-cell housed since reception, and that plaintiff was not having any problems with his cellmate. (Id.) However, plaintiff also stated "he would have problems from the other inmates if he could not get to an approved yard." (Id.) The committee notes further reflect

---

[4] Plaintiff states he was transferred to CSP-SAC on December 16, 2000. (Blajos Decl., ¶ 12.) Defendant Borrego states plaintiff was moved on December 17, 2000. (Deft. Borrego's Stmt. Undisp. Facts, ¶ 20.)

1  plaintiff was assigned a walk alone yard based on lack of information on enemies and gang
2  affiliation. (Id.)  Defendant Borrego is not named in the CDC-128G form either as a witness in
3  the ICC hearing or as a committee member on the ICC hearing panel. (Id.)
4       On December 26, 2000, plaintiff was reassigned to a new yard, A6-7.
5  (Blajos Decl., ¶ 14; Pitoniak Decl., Attachment 9.)  Defendant Borrego is not named in the CDC-
6  128G form either as a witness or as a committee member.[5]  (Id.)
7       Following plaintiff's yard placement on December 26, 2000, the
8  Administrative Segregation Log reflects that plaintiff participated in yard exercises in the
9  controlled and compatible yard that he was assigned on December 27, 2000, December 30, 2000,
10 January 1, 2001, and January 3, 2001.  There is no indication that plaintiff refused yard or
11 requested to remain in his cell during these dates.  From memory, plaintiff only recalls going to
12 the yard "twice" but staying there for one to two hours.  Plaintiff admits he had no problems or
13 fear while on the yard prior to the assault on January 6, 2001, including from inmates Perez and
14 Minor.
15      On December 28, 2000, the CDCR 115 disciplinary was adjudicated.
16 Plaintiff was found not guilty and the 115 was dismissed.
17      On January 6, 2001, plaintiff was assaulted on the FA6 Block of the
18 exercise yard at CSP-SAC by inmates Minor and Perez.  The parties dispute the extent of
19 petitioner's injuries.
20      Inmates Minor and Perez were not listed as known enemies of plaintiff
21 before the January 6, 2001 incident.  Inmates Minor and Perez were placed on plaintiff's enemy
22 list or CDC Form 812 after the assault.

---

[5] Defendants state an ICC hearing took place on December 26, 2000.  Plaintiff contends no formal hearing took place; rather, defendant Bunnell, accompanied by someone named "Hernandez," approached plaintiff's cell and informed plaintiff he would be assigned to the A6-7 yard. (Blajos Decl., ¶ 14.)  Defendant Bunnell signed the CDC-128G form as Chairperson, but there is no reference to a person named "Hernandez." (Pitoniak Decl., Attachment 9.)

In terms of injunctive relief, plaintiff does not know what he is seeking by way of his request. The only apparent reason the claim is in his complaint is because another inmate inserted it.

b. Legal Standards[6]

Under the Eighth Amendment, prison officials have a duty to protect prisoners from violence at the hands of other inmates; a prison official's deliberate indifference to a substantial risk of harm to an inmate violates the Eighth Amendment. Farmer v. Brennan, 511 U.S. 825, 827, 833 (1994). To succeed on a claim of deliberate indifference to the threat of serious harm or injury by another prisoner, plaintiff must demonstrate that the deprivation of his rights was "objectively, sufficiently serious." Id. at 834. When the claim is predicated upon the failure to protect, the deprivation is deemed to be sufficiently serious if there was a substantial risk that the prisoner would suffer serious harm. Id. The prisoner must also demonstrate that the defendant had a "sufficiently culpable state of mind." Id. The prisoner must demonstrate that the defendant knew of and disregarded an excessive risk to his safety: "the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." Id. at 837. "[D]eliberate indifference entails something more than mere negligence . . . [but] is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." Hearns v. Terhune, 413 F.3d 1036, 1040 (9th Cir. 2005), quoting Farmer, supra, 511 U.S. at 835.

A two-part test applies to analysis of the qualified immunity defense. Martinez, at 1183 (citing Saucier v. Katz, 533 U.S. 194, 201-02 (2001). First, the court looks at "whether the facts alleged 'show [that] the officer[s'] conduct violated a constitutional right," and second,

---

[6] Failure to protect claims are specifically covered by the Eighth Amendment. Farmer, 511 U.S. at 832-33. Plaintiff is entitled to no greater protection than the Eighth Amendment. Whitley v. Albers, 475 U.S. 312, 327 (1986). Thus, the court need not analyze this case under the substantive due process clause of the Fourteenth Amendment. County of Sacramento v. Lewis, 523 U.S. 833, 943 (1998).

8

"whether the constitutional right in question was 'clearly established' such that 'it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.'" <u>Martinez</u>, <u>id</u>. (quoting <u>Saucier</u>, 533 U.S. at 201-02.)

  c. Application

  Plaintiff argues that a reasonable trier of fact could find defendant Borrego culpable herein because the evidence indicates that

> (1) Borrego knew that a present "hit contract" existed for plaintiff at the Sacramento facility; (2) Borrego expressed knowledge of the "enemies" information in plaintiff's file and had possession therefor; (3) the lack of information shown in plaintiff's file indicating no follow-up investigation and documentation by Borrego demonstrates Borrego indifferently ignored his duties under 15 CCR § 3378 to investigate and document the threat to plaintiff known to Borrego; Borrego knew plaintiff was not implicated in the Osuna assault and told plaintiff that; Borrego was anxious to get plaintiff to incriminate another inmate and was upset that he did not; (6) Borrego made a disciplinary report concerning plaintiff that was false; (7) Borrego would have known that referral of the assault allegation against plaintiff would likely result in his transfer to Sacramento; (8) Borrego knew that he could influence transfer to Sacramento and used the word "we" in regard to decisions about sending plaintiff to Sacramento and claimed to have "juice with the warden"; (9) plaintiff was exonerated of implication in the Osuna assault and even though Osuna was to be listed as an "enemy" of plaintiff, Osuna's name was not added to the list of plaintiff's enemies.

(Pl.'s July 30, 2006 Mem. P's & A's at 7.)  However, even assuming all these inferences to be true, plaintiff has not demonstrated a causal nexus between defendant Borrego and plaintiff's January 6, 2001 assault.  At the times relevant herein, defendant Borrego was a correctional officer at Folsom State Prison.  It is undisputed that defendant Borrego had no official authority to place plaintiff into Administrative Segregation.  So, even if defendant Borrego was aware of all of these facts as viewed by plaintiff, defendant Borrego was not in a position to place plaintiff out of harm's way either at FSP or once plaintiff was transferred to CSP-Sacramento.  <u>Leer v. Murphy</u>, 844 F.2d 628, 633-34 (9th Cir. 1988)(plaintiff must demonstrate individual defendant was in a position to take steps to avert the incident, but failed to do so intentionally or with

deliberate indifference.)  Even if defendant Borrego had followed through and added Osuna to plaintiff's list of enemies, plaintiff has not established that plaintiff would have been housed any differently at CSP-Sacramento.  Inmate Osuna was housed at FSP at the time of the assault on Osuna, and there is no evidence that inmate Osuna was present on the A6-7 yard when plaintiff was attacked or that Osuna was transferred to CSP-SAC.

While plaintiff maintains defendant Borrego could influence whether or not plaintiff was transferred, there is no evidence that defendant Borrego was in a position to make decisions concerning plaintiff's housing.  Defendant Borrego has provided declarations confirming that correctional officers are not involved in classification hearings or prison transfers. (Schroeder Decl. at 4; Borrego Decl. at 2-3; Pitoniak Decl. at 3; Rendon Decl. at 2.)

In addition, even if defendant Borrego knew that a "hit contract" existed at CSP-SAC as of November 16, 2000, plaintiff has not demonstrated that defendant Borrego was in a position to avert what happened at CSP-SAC.  While defendant Borrego could have noted such a threat in plaintiff's file, plaintiff has not demonstrated that such failure to document such a threat was intentional or deliberately indifferent on defendant Borrego's part.  Moreover, plaintiff has not shown that Borrego's alleged failure to document the threat was the actual and proximate cause of the January 6, 2001 assault at CSP-SAC because there is no evidence to demonstrate why Munoz and Perez attacked plaintiff.  On this record, the court cannot find that inferences of deliberate indifference can be drawn from defendant Borrego's part in the chain of events that started with plaintiff being charged by defendant Borrego in prison disciplinary proceedings with an assault on inmate Osuna at FSP and ended with the attack on plaintiff at bar in an exercise yard at CSP-SAC.

Accordingly, this court cannot find that defendant Borrego was deliberately indifferent to plaintiff's Eighth Amendments rights.  Defendant Borrego's motion for summary judgment should be granted.

/////

II. Defendant Bunnell's Motion for Summary Judgment

      a. Undisputed Facts

Plaintiff and defendant Borrego agree that the following facts are undisputed.

Plaintiff was a member of the Chicos and Pelerosos street gangs when he entered prison, which are Hispanic street gangs from the Hawaiian Gardens section of Los Angeles whose members are known as "Southern Hispanics" or "South Siders" in the California prison system.

Plaintiff is the cousin of a well known member of the Mexican Mafia.

Shortly after he arrived at prison, plaintiff was placed in protective custody because he came into conflict with Southern Hispanic inmates who were members of a prison gang known as the Mexican Mafia (EME) after he refused to carry out an assault on another inmate aligned with a rival prison gang known as Nuestra Familia (aka "NF")(hereafter referred to as the "78 incident").

Protective custody is a process CDCR used to, among other things protect an inmate from harm at the hands of other inmates by segregating the inmates from the general prison population.

Plaintiff remained in protective custody for a five year period that ended on or about December 9, 1983.

On or about December 9, 1983, an Institutional Classification Committee transferred plaintiff out of protective custody housing and back to general population housing. Defendant Bunnell was not a member of this committee, and did not other participate in the decision to transfer plaintiff back to general population.

Plaintiff was accused of participating in an assault on an inmate named Osuna on the general population exercise yard on November 15, 2000, and was placed in administrative segregation at Folsom State Prison pending further investigation.

/////

Inmate Osuna is a Border Brother. The Border Brother inmate group is comprised primarily of inmates that are Mexican Nationals.

The Southern Hispanics inmate group is comprised primarily of Hispanic street gang members from southern California, and the Mexican Mafia is almost exclusively of inmates from the Hispanic inmate group.

The Northern Hispanics are another inmate group comprised primarily of Hispanic street gang members from northern California, and the Nuestra Familia is comprised almost exclusively of inmates from the Northern Hispanic inmate group.

On November 22, 2000, an Institution Classification Committee decided to retain plaintiff in administrative segregation based on formal charges that he assaulted inmate Osuna, and the committee assigned plaintiff to a Controlled and Compatible Southern Hispanic yard. Plaintiff was present at the hearing. Defendant Bunnell was not a member of this committee, and did not otherwise participate in the decision to place plaintiff in administrative segregation.

Plaintiff was not assaulted on the Controlled and Compatible Southern Hispanic yard at FSP.

Plaintiff was found not guilty of participating in the assault on inmate Osuna.

On December 17, 2000, plaintiff was transferred from the administrative segregation unit at Folsom State Prison to the administrative segregation unit at CSP-SAC. CSP-SAC is a newer prison located adjacent to Folsom State Prison and the administrative segregation unit at CSP-SAC was used to house administrative segregation inmates from Folsom State Prison on an as-needed basis. Defendant Bunnell was not involved in the decision to transfer plaintiff to the administrative segregation unit at CSP-SAC.[7]

---

[7] Defendant Bunnell concedes, for purposes of summary judgment only, that plaintiff was not given notice and hearing prior to his transfer to CSP-SAC, a higher security level institution, as required by 15 CCR § 3375(f)(1), but argues it is not relevant since defendant Bunnell was not involved in the decision to transfer plaintiff to the administrative segregation unit at CSP-SAC.

On December 19, 2000, plaintiff appeared before an Institution Classification Committee at CSP-SAC for an administrative segregation review and yard assignment. The Committee was chaired by Acting Associate Warden Jackson, and Facility Captain Rianda and Psychologist Carey were members of the committee. The Chrono states "S participated in committee and stated that he would have problems from the other inmates if he could not get to an approved yard." Plaintiff was assigned to the walk-alone yard due to lack of information regarding enemies and gang affiliation and expressed his concerns regarding other inmates if he was not assigned to a proper yard. Defendant Bunnell was not a member of this committee, and did not otherwise participate in the decisions reached by the committee.

On December 26, 2000, plaintiff was reassigned to a new yard, A6-7.[8] The parties dispute the procedures surrounding the decision to reassign plaintiff to yard A6-7.[9] However, the

---

[8] Defendants state an ICC hearing took place on December 26, 2000. Plaintiff contends no formal hearing took place; rather, defendant Bunnell, accompanied by someone named "Hernandez," approached plaintiff's cell and informed plaintiff he would be assigned to the A6-7 yard. (Blajos Decl., ¶ 14.) Defendant Bunnell signed the CDC-128G form as Chairperson, but there is no reference to a person named "Hernandez." (Pitoniak Decl., Attachment 9.)

[9] Defendant objects that plaintiff's position with regard to the December 26, 2000 "committee" has changed over time. In plaintiff's June 14, 2005 declaration, he states:

> On December 26, 2000, I was reassigned to a new yard, A6-7 by a committee headed by Bunnell. Mindful that Bunnell had told me that he "had me covered", and not knowing of his EME connections at the time, I did not express disagreement with this assignment.

(Blajos Decl., at ¶ 14 [Docket No. 67].) During plaintiff's deposition, the following exchange took place:

> Q. And then you only had this one conversation with Bunnell after you went to New Folsom [CSP-SAC] where he said better you than me?
>
> A. I know we had the regular committee where he put me on the yard, and then after I got whacked, then I had the conversation with him.

(Blajos Depo. at 244:16-21.)

parties do not dispute that defendant Bunnell signed the CDC-128G form reassigning plaintiff to yard A6-7.  (Blajos Decl., ¶ 14.)  Whether or not this decision was made by defendant Bunnell or by a committee, it is undisputed that defendant Bunnell played a role in reassigning plaintiff to yard A6-7.

After he was placed on the Controlled and Compatible Southern Hispanic yard at CSP-SAC, plaintiff took exercise on the yard with inmates Minor, Perez and others on December 27, 2000, December 30, 2000, and January 1, 2001, without incident.

Inmates Minor and Perez were not known enemies of plaintiff and were not on plaintiff's confidential or non-confidential enemy lists when the committee assigned plaintiff to the yard, or plaintiff would not have been assigned to the yard.  Plaintiff has no information to the contrary.

Plaintiff claims that there was a "shot caller" on another yard at CSP-SAC, and that the Mexican Mafia appointed that person as the shot caller.  But he does not know if the shot caller ordered Minor or Perez to commit the assault.

As the Associate Warden of Programs and Housing, defendant Bunnell would have been notified shortly after plaintiff was stabbed because all such incidents raise concerns for the safety and security of the institution, and he would have been apprised of information learned

---

However, in his new declaration filed in support of the instant motion, plaintiff states:

> On December 26, 2000, I was reassigned to a new yard, A6-7 by Bunnell.  While this assignment is reflected in a supposed Chrono as a committee meeting, no formal committee meeting was actually held.  I was just approached by Bunnell, who was accompanied by one other individual, whose name I believe was Hernandez, and told that I was assigned to the A6-7 yard.  Neither Bunnell nor the other individual had my file at that time nor did either of them make any mention of reviewing my file.  Mindful that Bunnell had told me that he "had me covered", I did not express disagreement with this assignment, although Bunnell did not request any input from me on the matter.  He just told me that A6-7 was my assignment.

(Blajos Decl., at ¶ 14 [Docket No. 118].)

14

about the stabbing leading up to the committee hearing, including information plaintiff gave to medical staff and investigators about the stabbing.

Defendant Bunnell knows the meaning of the terms "in the hat." (Bunnell Depo. 39:10-13 ("If you're in the hat, typically some faction is after you for some particular reason."))

Plaintiff did not file an administrative grievance regarding this incident until six or seven months after he was stabbed. Plaintiff's administrative grievance was denied as untimely. Plaintiff filed administrative grievances to the second and third levels of review regarding the incident; these grievances were also denied as untimely.

b. Legal Standards

As noted above, plaintiff must demonstrate that the defendant knew of and disregarded a substantial risk of serious harm to his safety. Farmer v. Brennan, 511 U.S. 825, 827, 833 (1994).

c. Application

Plaintiff concedes that defendant Bunnell was not involved in the decision to transfer plaintiff from protective custody housing and back to the general population in 1983. "Liability under section 1983 arises only upon a showing of personal participation by the defendant." Taylor v. List, 880 F.2d 1040, 1045 (9th Cir. 1989). Because defendant Bunnell was not involved in plaintiff's transfer from protective custody to the general population in 1983, the 1983 transfer is not at issue here.

Plaintiff was housed in protective housing from approximately 1978 through 1983. Official records reflect that from 1983 through November 2000, plaintiff was an inmate housed in the general population at various prison facilities. Although plaintiff objects that these placements were "soft yards" where he was not exposed to active gang enemies usually housed at Level III or IV facilities, the bottom line is, plaintiff was housed without incident for over 17 years in progressively less protective housing than his initial placement.

/////

1  It is undisputed that plaintiff was a Southern Hispanic and had successfully
programmed without incident on a Southern Hispanic yard at Folsom State Prison.  None of the
inmates on the Southern Hispanic Yard at CSP-SAC were known enemies of plaintiff.

Plaintiff stated in his deposition that to his recollection there were not any
members of the EME on the A6-7 yard where he was assaulted.  (Pl.'s Depo. at 152.)  It is
undisputed that inmates Minor and Perez were not listed as known enemies of plaintiff before the
January 6, 2001 incident.  Plaintiff confirmed that inmate Minor was not an EME member and
that he did not believe inmate Perez was an EME member.  (Pl.'s Depo. at 156.)  Plaintiff denied
he had any reason to believe that Minor or Perez posed a threat to him in any fashion.  (Pl.'s
Depo. at 118.)  Plaintiff did not know that Minor and Perez were his enemies.  (Pl.'s Depo. at
203.)  Plaintiff further conceded that he had no information, witnesses or other evidence to
demonstrate that any EME member ordered Minor or Perez to stab him.  (Pl.'s Depo at 156.)
Plaintiff confirmed that the only incident he'd had in prison that he believed was related to the hit
out on him by the Mexican Mafia was the stabbing that occurred in January of 2001 at New
Folsom (CSP-SAC).  (Pl.'s Depo. at 247.)

It is undisputed that plaintiff took exercise on the CSP-SAC Controlled and
Compatible Southern Hispanic yard with inmates Minor, Perez and others on December 27,
2000, December 30, 2000, and January 1, 2001, without incident.

Plaintiff has provided no evidence connecting the 78 incident or the Mexican
Mafia to the January 2001 attack on plaintiff.

Given this lack of evidence, and the fact that plaintiff had been successfully
housed without incident up until the attack on January 6, 2001, including previous placement on
a Southern Hispanic yard, the court cannot find that defendant Bunnell was aware of a substantial
risk to plaintiff by his placement in the A6-7 yard.

Even assuming defendant Bunnell had specific knowledge of a threat against
plaintiff, that plaintiff was "in the hat," and did not properly investigate threats against plaintiff

before removing plaintiff from the walk alone yard, the threat information contained in plaintiff's file pertained to the Mexican Mafia and the EME from 1978. Because plaintiff was placed in a Southern Hispanic yard, one in which plaintiff had successfully programmed before, and there were no Mexican Mafia or EME-connected persons on the A6-7 yard, defendant Bunnell's decision to place plaintiff on the A6-7 yard as opposed to leaving him on the walk alone yard cannot be construed as deliberately indifferent to a substantial risk of harm. See Berg v. Kincheloe, 794 F.2d 457, 460 (9th Cir. 1986)(Berg "failed to come forward with facts showing that these defendants had any reason to believe he would be attacked by the assailant.")

Accordingly, the court will recommend that defendant Bunnell's motion for summary judgment be granted.[10]

III. Injunctive Relief

During his deposition, plaintiff stated he did not know what he was seeking by way of this request and that it appeared it was inserted by another inmate. (Pl.'s Depo. at 34-36.) Plaintiff did not brief nor address the issue of injunctive relief in his opposition to either motion.

In order to seek prospective injunctive relief, plaintiff must demonstrate that "he is realistically threatened by a repetition of [the violation]." City of Los Angeles v. Lyons, 461 U.S. 95 (1983)(plaintiff cannot establish the requisite type of harm simply by pointing to some past injury). Plaintiff has failed to demonstrate that the injury plaintiff sustained at CSP-SAC is likely to recur or that prison officials have failed to appropriately house him since the 2001 attack. Plaintiff's motion for injunctive relief should be denied.

IV. Failure to Exhaust Administrative Remedies

On August 31, 2004, the district court adopted this court's findings and recommendations denying defendants' motion to dismiss this case for plaintiff's failure to exhaust administrative remedies. The court found plaintiff attempted to file grievances on

---

[10] Because plaintiff has not established any violation of a constitutional right, the court need not adjudicate the defense of qualified immunity. Saucier v. Katz, 533 U.S. 194 (2001).

several occasions but was blocked by prison officials' failure to provide documents necessary to support his grievance. Moreover, the court noted plaintiff had waited to file a grievance until after he left CSP-Sacramento since it was officials there who had put his life in danger.

Defendants now assert that in light of the recent Supreme Court case <u>Woodford v. Ngo</u>, ____ U.S. ____, 126 S.Ct. 2378 (2006), plaintiff did not exhaust his administrative remedies. In <u>Ngo</u>, the Supreme Court held that a prisoner does not satisfy the PRLA administrative exhaustion requirement by filing an untimely or otherwise procedurally defective administrative appeal. <u>Ngo</u>, 126 S.Ct. at 2382. Because the court finds that summary judgment should be granted to defendants on the merits, it does not reach the issue of exhaustion.

In accordance with the above, IT IS HEREBY RECOMMENDED that:

1. Defendant Borrego's June 29, 2006 motion for summary judgment be granted;

2. Defendant Bunnell's July 6, 2006 motion for summary judgment be granted; and

3. This action be dismissed.

These findings and recommendations are submitted to the United States District Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l). Within ten days after being served with these findings and recommendations, any party may file written objections with the court and serve a copy on all parties. Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendations." The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

DATED: January 25, 2007.

UNITED STATES MAGISTRATE JUDGE

001; blaj1454.57